IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ANDREW T. ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 10-CV-3336 |
| | ) | |
| VIPIN SHAH and | ) | |
| RN KESTERSON,[1] | ) | |
| | ) | |
| Defendant, | ) | |

OPINION

SUE E. MYERSCOUGH, U.S. District Judge.

Plaintiff, incarcerated in the Illinois Department of
Corrections, pursues claims for deliberate indifference to his
serious medical needs regarding his right hand.  He is represented
by pro bono counsel Ashley DiFilippo.

Defendants move for summary judgment, which must be
denied.  Though Plaintiff did receive substantial medical care for his
hand, an inference of deliberate indifference cannot be ruled out
regarding Plaintiff's need for effective pain medicine, a low bunk,

_____

[1] The other Defendants have been dismissed.

and treatment for his hand on November 12 and December 22, 2010, after the surgery.  Accordingly, this case will go to trial.

SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material]  fact."  Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists.  Id.; Harvey v. Town of Merrillville, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment."  McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the

light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. Id.

## FACTS

The Court sets forth these facts for purposes of this order only. Material disputes have been resolved in Plaintiff's favor. The Court has not considered any additional facts set forth in Plaintiff's response which were not separately set forth as required by Local Rule 7.1(D)(2)(b)(5).

In November 2009, before Plaintiff's incarceration, a flat screen television fell on Plaintiff's right hand. Plaintiff had surgery but then reinjured his hand when he punched someone with his cast on. Plaintiff did not go straight to the doctor after he reinjured his hand and was arrested before he obtained medical care.

On February 6, 2010, at the Illinois Department of Correction's Stateville Northern Reception Center, an x-ray of Plaintiff's hand revealed a fracture. Plaintiff was referred to the University of Illinois Medical Center for a surgical consultation.

Surgery was recommended, and Plaintiff received that surgery on April 26, 2010. At his follow-up appointment on May 4, 2010, Plaintiff's cast was intact and he had a good range of motion.

Plaintiff did not have a way to keep his cast dry when he showered at the Reception Center. Consequently, the cast became dirty and mildewed. A nurse determined that the cast had to be replaced so she removed the cast and did her best to put a new cast on, though she admitted that she did not know what she was doing. The new cast was loose from the start.

Plaintiff had another appointment scheduled with the University of Illinois Medical Center, but Plaintiff decided to forgo that appointment so that his transfer to a prison closer to his new-born son could be processed. On May 27, 2010, Plaintiff was transferred to Western Illinois Correctional Center. By the time of Plaintiff's transfer, his new cast had become so loose that the cast was flapping around and causing Plaintiff pain. Plaintiff therefore took the cast off completely before his transfer to Western.

The medical records from the date Plaintiff arrived at Western Illinois Correctional Center reflect that Defendant Dr. Vipin Shah took a quick look at Plaintiff's hand and ordered a low bunk for

Plaintiff until July 31, 2010.  Plaintiff had also had a low bunk permit at the Stateville Northern Reception Center.  However, for reasons not in the record, Plaintiff was not informed of Dr. Shah's order for a low bunk.  In fact, whether anyone beyond the nurse and doctor knew of the low bunk order is not clear.  Plaintiff was assigned an upper bunk despite the order.

On June 25, 2010, Plaintiff saw Dr. Shah about an ingrown toenail.  Plaintiff asked for a low bunk, but Dr. Shah denied the request, even though Dr. Shah had already ordered a low bunk for Plaintiff through July.  According to Plaintiff, Dr. Shah remarked that Plaintiff "would not be pampered here."  (Pl.'s Dep. p. 104.)  At this appointment, Plaintiff also asked Dr. Shah for a follow up appointment with the hand surgeon and relayed Plaintiff's concerns about needing a new cast.  Id.

On or about October 10, 2010, Plaintiff fell out of his top bunk bed, injuring his right hand again.  He was not able to report the injury to a guard until yard time.  A different doctor, Dr. Wahl, ordered an x-ray and 400 milligrams of Ibuprofen.

Plaintiff saw Dr. Shah on October 18, 2010, but the x-ray results had not been received.  Dr. Shah ordered a continuing low

bunk permit and 400 milligrams of Ibuprofen. According to Plaintiff, Dr. Shah told Plaintiff to get out and that Dr. Shah did not think that Plaintiff's hand was broken. Plaintiff left not knowing when or whether he might get medical attention.

Plaintiff's x-ray showed the hardware that had been placed in Plaintiff's hand in the prior surgery and also showed "degenerative narrowing of the fifth metacarpal joint space with marginal spurring along with no fracture, dislocation or bony abnormality." (Defs.' Undisputed Proposed fact 31.) On October 24, 2010, Dr. Shah consulted with other physicians employed by Wexford Health Sources, Inc., in what Dr. Shah calls a "collegial review." The physicians agreed that Plaintiff should be sent to an orthopedic specialist for a surgery consultation. The consultation with the specialist was scheduled for November 15, 2010, but Plaintiff was not told this for security reasons. (This Court knows from other cases that outside appointments are generally not disclosed to an inmate in order to reduce the risk of escape attempts.)

On November 12, 2010, one of the pins inside of Plaintiff's right hand broke through his skin and then retreated back into Plaintiff's hand. According to Plaintiff, his hand was painful and

draining.  Defendant Nurse Kesterson cleaned the area, applied antibiotic ointment and a bandage.  Nurse Kesterson checked the chart and saw that Plaintiff's surgery consultation had been scheduled, but she did not tell Plaintiff about the appointment, again for security reasons.

On November 15, 2010, Plaintiff was evaluated by Dr. Mark Green, an orthopedic surgeon at Passavant Area Hospital in Jacksonville, Illinois.  Dr. Green recommended the removal of all the hardware in Plaintiff's right hand and prescribed Tylenol 3 for Plaintiff's pain.  (Passavant Hosp. Recs., Defs.' Ex. G, pp. 76, 79.) However, back at the prison Dr. Shah prescribed Ibuprofen, not Tylenol 3.  In Dr. Shah's opinion, "based upon his evaluation of the Plaintiff on November 16, 2010, as well as his previous evaluations of the Plaintiff, . . . the Plaintiff did not require Tylenol 3 or any other narcotic pain reliever on November 16, 2010." (Dr. Shah Aff. para. 29.)  Plaintiff asserts that the Ibuprofen did not help his severe pain.

On Sunday, November 18, 2010, a pin in Plaintiff's right hand pushed through the skin again, green fluid leaking from the hole. Plaintiff was taken to the health care unit, where the nurse called

Dr. Shah. Dr. Shah told the nurse to send Plaintiff back to his unit and that Dr. Shah would see Plaintiff the next day. Dr. Shah also refused Plaintiff's requests for stronger pain medicine. According to Plaintiff, the pain by this point was so severe that he was only getting about one hour of sleep at night. (Pl.'s Dep. p. 92.)

Dr. Shah saw Plaintiff the next morning, on November 19, 2010. According to Plaintiff, the loose pin was visible and Plaintiff's hand was still draining green fluid, but Dr. Shah told Plaintiff there was nothing Dr. Shah could do for Plaintiff and sent Plaintiff back to his unit. However, Plaintiff does not appear to dispute that Dr. Shah did prescribe an antibiotic and a longer acting pain medicine, Naproxen, at this time. Plaintiff went back to his unit, but then the pin ripped through Plaintiff's hand again. This time the pin stayed out, green discharge continuing to leak. Plaintiff was taken to see Dr. Shah again, but Dr. Shah again said there was nothing he could do and ordered Plaintiff back to his unit. At this point, according to Plaintiff, a nurse intervened on Plaintiff's behalf. (Pl.'s Dep. pp. 92-94.) Plaintiff was given stronger pain medicine and taken to the emergency room per the direction of the prison health care administrator. At the hospital, Dr. Green removed the pin and

again prescribed Tylenol 3. (Pl.'s Dep. p. 96.) Plaintiff was transported back to prison that day. Plaintiff does not dispute that the medical records show that Plaintiff received Vicodin after returning to the prison on November 19, 2014, as well as for the rest of November. However, Dr. Shah did not order the Vicodin. The medical records appear to show that a nurse practitioner ordered the Vicodin, though the parties do not address this issue. (11/21/10 medical records, Ex. G, p. 71.)

On November 29, 2010, Dr. Shah consulted with other physicians in another collegial review. Dr. Shah recommended that Plaintiff be scheduled for surgery to remove the rest of the hardware from Plaintiff's hand. Plaintiff was approved for surgery, which was scheduled for December 13, 2010. In the meantime, Plaintiff continued to experience what he describes as severe pain and a constant green drainage from his hand. At this point Dr. Shah prescribed Ultram for Plaintiff, which Dr. Shah describes as a stronger pain reliever than Ibuprofen.

The removal surgery occurred as planned on December 13, 2010. Dr. Green directed Plaintiff to rest the day of the surgery and then increase activity as tolerated, to keep his right hand elevated,

to move his fingers, and to return for an appointment in one week. Dr. Green noted that Plaintiff's dressing could be removed and the hand washed 48 hours after the surgery. (Patient Discharge Instructions, Defs.' Ex. G, p. 54.) For pain, Dr. Greene prescribed Ultram twice a day and Norco every 3 to 4 hours as needed. Id.[2]

Dr. Shah saw Plaintiff on December 17, 2010, to check on Plaintiff after Plaintiff's surgery. Dr. Shah ordered that Plaintiff received Vicodin twice a day for a week for Plaintiff's pain.

A week after the surgery, on December 20, 2010, Plaintiff saw Dr. Green for a follow-up appointment. The progress note states "incision well healed with slight redness noted but no drainage." (12/20/10 Passavant Progress Note, Defs.' Ex. G, p. 20.) Dr. Green again prescribed Ultram twice a day and Norco every three to four hours as needed for pain. Id. p. 19. However, back at the prison Dr. Shah did not prescribe Ultram or Norco or allow Dr. Green's prescription to be filled. Further, Dr. Shah discontinued the Vicodin and instead prescribed Ibuprofen. Dr. Shah concluded from his evaluation of Plaintiff at that time that stronger pain medicine was unnecessary.

_____

[2] According to www.drugs.com (last visited 2/14/14), Norco is a combination of hydrocodone (a narcotic) and acetaminophen.

Two days later, on the evening of December 22, 2010, Plaintiff attended sick call for complaints of a sore throat and what he feared was an infection in his hand. According to Plaintiff, the bandage on his hand was filthy with drainage from his hand, but Nurse Kesterson refused to change Plaintiff's bandage or look at his hand. Nurse Kesterson denies this, but the Court must accept Plaintiff's version at this stage. The parties agree that Nurse Kesterson scheduled Plaintiff to see a doctor on December 27, 2010, and advised Plaintiff to gargle, increase fluids, and return to the health care unit if Plaintiff's symptoms persisted. Nurse Kesterson also signed Plaintiff up for the sick call line the next day to make sure that Plaintiff's symptoms had not worsened. A nurse practitioner saw Plaintiff twelve hours later, on December 23, 2010, and noted normal, post-surgery drainage. The nurse practitioner prescribed an antibiotic, but the parties dispute whether the antibiotic was for Plaintiff's hand or for his sore throat.

On January 1, 2011, Plaintiff saw Dr. Shah and reported that his right hand was "popping out." Dr. Shah noted that Plaintiff had decreased mobility in his right hand. Dr. Shah ordered an x-ray, which showed only mild swelling.

Plaintiff saw Dr. Green on January 17, 2011, for an evaluation and follow-up appointment. Another x-ray was taken, which showed that the pins had been removed and that no acute fractures were present. (1/17/11 Passavant x-ray, Defs.' Ex. G, p. 16.) However, Plaintiff continued to experience pain in his hand. Plaintiff saw Dr. Shah on January 19 and 26, 2011, for those complaints. Dr. Shah directed Plaintiff to keep his hand elevated and to continue his current pain medicine. Dr. Shah told Plaintiff that Dr. Shah would follow-up with Plaintiff about seeing an orthopedic specialist or a physical therapist. After further collegial review, these recommendations were implemented.

Plaintiff again saw Dr. Shah again on February 4, 2011, demanding Vicodin for his pain. Dr. Shah continued with the Ibuprofen, which has an anti-inflammatory effect to treat Plaintiff's mild swelling. Vicodin and Tylenol 3 are not anti-inflammatories. Plaintiff saw a physical therapist on March 8, 2011 and was taught different exercises to decrease swelling, improve range of motion, and strengthen his hand. However, Plaintiff later had difficulty replicating those exercises on his own and received no further instruction.

Plaintiff saw Dr. Shah on March 21, 2011. Dr. Shah described Plaintiff's range of motion as normal, but Plaintiff disputes this. Dr. Shah advised Plaintiff to continue the physical therapy and increased Plaintiff's pain medicine from Ibuprofen to Ultram.

Dr. Green saw Plaintiff on March 24, 2011 and took another x-ray, which showed a progressively healed fracture, no fractures or bony erosions, but some osteoporosis around the fourth and fifth digits. When Dr. Shah saw Plaintiff a few days later, Dr. Shah noted that the hand was not yet completely healed. Dr. Shah advised Plaintiff to continue his physical therapy, which Plaintiff had been doing to the best of his ability. Defendants suspect that Plaintiff was simply not trying to do his physical therapy exercises, but the Court must credit Plaintiff's version at this stage. At the March 24th visit, Dr. Shah ordered a follow-up appointment with Dr. Green in one month. This was the last time Dr. Shah saw Plaintiff because Dr. Shah transferred to work at Pinckneyville Correctional Center.

By May, 2011, Plaintiff reported to his new doctor, Dr. Baker, that the Ibuprofen and Ultram were helping with his pain. Plaintiff could make a fist with his right hand but had decreased grip

strength, and Plaintiff had full movement in his fingers. At the time of Plaintiff's deposition in April of 2013, Plaintiff was able to work out, lift weights, do bench presses, and do 50-60 knuckle push-ups at a time. However, some strength training exercises must be adapted to prevent Plaintiff's right hand from giving out. For example, when weightlifting Plaintiff must tie his right hand to the weight. Plaintiff no longer takes any pain medicine.

## ANALYSIS

Deliberate indifference to an inmate's serious medical need violates the Eighth Amendment. Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012). Plaintiff's hand presented a serious medical need. The question is whether a rational juror could find that Defendants were deliberately indifferent to that need.

A professional difference of opinion generally is not evidence of deliberate indifference, provided that both opinions are within the range of accepted professional judgment. Holloway v. Delaware County Sheriff, 700 F.3d 1063 (7th Cir. 2012)(jail doctor's refusal to prescribe narcotic pain medicine which had been prescribed for detainee before his detention was not deliberate indifference where jail doctor prescribed non-narcotic pain relievers and detainee had

complained of pain only once, the day before release); <u>Norfleet v.</u>
<u>Webster</u>, 439 F.3d 392, 396, 396 (7th Cir. 2006)("[A] difference of
opinion among physicians on how an inmate should be treated
cannot support a finding of deliberate indifference").  However, the
failure to follow a specialist's recommendation might allow an
inference of deliberate indifference.  <u>Gil v. Reed</u>, 381 F.3d 649, 663-
64 (7th Cir. 2004).  Additionally, a doctor's refusal to treat an
inmate's pain can rise to the level of deliberate indifference.

Dr. Shah correctly points out that Plaintiff received substantial
medical care for his hand:  surgical consultations, two surgeries, x-
rays, physical therapy, trips to the emergency room, pain medicine
(though not as strong as Dr. Green had prescribed), and multiple
doctor appointments.  A rational jury could certainly find in
Defendants favor on this record.  But the question at this stage is
whether a rational jury could find in Plaintiff's favor.

Dr. Shah is correct that the Eighth Amendment does not
promise "specific care" or "the best care possible."  <u>Forbes v. Edgar</u>,
112 F.3d 262 (7th Cir. 1997).  The Eighth Amendment requires only
reasonable measures in the face of known and substantial risks of
serious harm.  However, an Eighth Amendment claim can be based

on the denial of effective pain relief, if the pain is severe enough and can be easily remedied. <u>Williams v. Liefer</u>, 491 F.3d 710 (7th Cir. 2007)(affirming denial of summary judgment for six hour delay in providing nitroglycerine, which immediately relieved inmate's pain); <u>Gil v. Reed</u>, 381 F.3d 649 (7th Cir. 2004)(summary judgment reversed where jury could find delay caused "many more hours of needless suffering for no reason").

Dr. Green's prescriptions of narcotic pain relievers allows an inference that Plaintiff needed stronger pain relievers, at least for part of the time, and also tend to corroborate Plaintiff's testimony that the Ibuprofen did not help Plaintiff's pain. See <u>Gil v. Reed</u>, 381 F.3d 649, 663 (7th Cir. 2004)(inference of deliberate indifference arose when prison doctor failed to prescribe adequate substitute pain medicine for the Vicodin prescribed by an outside doctor after surgery). That Plaintiff had a pin sticking out of his hand from the inside and an infection also objectively corroborates Plaintiff's pain. A layperson could conclude that a loose pin escaping from inside one's body would be a painful experience. Additionally, Plaintiff's receipt of Vicodin in November, ordered by someone other than Dr. Shah, supports an inference that other medical personnel at the

prison believed that Plaintiff's pain was severe enough to warrant narcotic pain relief.

Pain is "uniquely subjective." <u>Hendrickson v. C</u>ooper, 589 F.3d 887, 893 (7th Cir. 2009); <u>Greeno v. Daley</u>, 414 F.3d 645, 655 (7th Cir. 2005)("[T]here is no requirement that a prisoner provide 'objective evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition."). Plaintiff describes his pain as severe, unmitigated by the Ibuprofen. Looking at the case in the light most favorable to Plaintiff, Dr. Shah knew that Plaintiff was in severe pain, knew that the Ibuprofen was not working, and knew that Dr. Green had prescribed stronger pain medicine. Plaintiff did receive stronger pain relief for part of this time, but not for the entire time that a rational juror might conclude was warranted. An inference of deliberate indifference cannot be ruled out based on Dr. Shah's refusal to provide stronger pain medicine.

An inference of deliberate indifference also arises from Dr. Shah's denial of Plaintiff's request for a low bunk in June 2010. Dr. Shah denies ever being asked for a low bunk, but the Court must credit Plaintiff's version at this stage. Plaintiff testified that Dr.

Shah denied Plaintiff's request for a low bunk despite knowing about Plaintiff's fairly recent hand surgery and lack of a cast, and despite the fact that Dr. Shah himself had already ordered a low bunk until the end of July, 2010. According to Plaintiff, Dr. Shah refused Plaintiff a low bunk, advising Plaintiff not to expect pampering in prison. This version of the facts allows an inference of deliberate indifference against Dr. Shah.

Drawing an inference of deliberate indifference against Nurse Kesterson is more difficult. On November 12, 2010, Plaintiff told Nurse Kesterson that a pin had broken through and gone back into Plaintiff's hand. Nurse Kesterson cleaned the area, applied antibiotic ointment and a bandage, and saw on the chart that Plaintiff was scheduled for a surgical consult in a few days. Whether this response was reasonable depends in large part whether Plaintiff's description of his hand and his severe pain is believed. If Plaintiff is believed, Nurse Kesterson arguably should have at least contacted the doctor to inform him that Plaintiff's condition had worsened.

The interaction between Nurse Kesterson and Plaintiff on December 22, 2010, also might allow an inference of deliberate

indifference if Plaintiff's version is believed. According to Plaintiff, Nurse Kesterson ignored Plaintiff's complaints about his draining hand, which Plaintiff believed was infected, and refused to look at the hand or change the filthy bandage. Nurse Kesterson did provide care for Plaintiff's sore throat and scheduled an appointment the next day, which weighs against an inference of deliberate indifference. Additionally, the nurse practitioner who saw Plaintiff the next day only described normal drainage, which contradicts Plaintiff's description. Concluding that Plaintiff presented to Nurse Kesterson with a serious medical need is difficult. However, the Court cannot conclude with confidence that no rational juror could find for Plaintiff and against Nurse Kesterson. Weighing inferences is not permissible at the summary judgment stage.

Defendants also argue for qualified immunity. However, their argument is based on construing the facts in their favor. As discussed above, even acknowledging that Plaintiff is not entitled to specific care and that a professional difference of opinion is not deliberate indifference, a rational juror could still conclude that Defendants were deliberately indifferent to Plaintiff's need for a low

bunk, effective pain medicine, and a reasonable response to Plaintiff's complaint of an infected hand on December 22, 2010. Qualified immunity does not protect Defendants, accepting Plaintiff's version of the facts.

**IT IS ORDERED:**

1.    Defendants' motion for summary judgment is denied (d/e 90).

2.    A final pretrial conference is scheduled for Friday, April 11, 2014, at 9:30 a.m. Plaintiff shall appear by video conference. Counsel shall appear in person. The trial date will be chosen at the final pretrial conference.

3.    An agreed, proposed final pretrial order is due April 1, 2014.

4.    Jury selection and trial are scheduled for June 10, 2014, at 9:00 a.m.

5.    Motions in limine are due April 1, 2014, with responses thereto due April 7, 2014.

6.    The Court will send out proposed jury instructions for discussion at the final pretrial conference. Additional or alternate instructions are due April 1, 2014.

7.    Plaintiff and Defense counsel must bring their

exhibits, marked, to the final pretrial conference.

8.    Objections to exhibits are due April 1, 2014.

Objections must attach the exhibit at issue.

9.    The clerk is directed to issue a video writ to secure

Plaintiff's presence at the final pretrial conference.

ENTER:    February 19, 2014

FOR THE COURT:


                                    **s/Sue E. Myerscough**
                                    SUE E. MYERSCOUGH
                                    UNITED STATES DISTRICT JUDGE